PHYLLIS GOSSINGER and HERMAN GOSSINGER, Plaintiffs–Appellants, v. ASSOCIATION OF APART-MENT OWNERS OF THE REGENCY OF ALA WAI, and CAROL SUTHERLAND, Defendants–Appellees

NO. 15320

(CIV. NO. 90–0186–01)

AUGUST 25, 1992

LUM, C.J., MOON, AND LEVINSON, JJ., AND INTERMEDIATE COURT OF APPEALS ASSOCIATE JUDGE HEEN, IN PLACE OF WAKATSUKI, J., RECUSED, AND INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, IN PLACE OF KLEIN, J., RECUSED

OPINION OF THE COURT BY LEVINSON, J.

The plaintiffs–appellants Phyllis Gossinger (Mrs. Gossinger) and Herman Gossinger (collectively the Gossingers) appeal an order granting summary judgment in favor of the defendants–appellees Association of Apartment Owners of the Regency of Ala Wai (the Association) and Carol Sutherland (Sutherland) on the Gossingers' negligence claim arising out of a slip and fall accident in their apartment. The Gossingers also appeal an order denying their motion for reconsideration of the summary judgment. We affirm both orders.

I.

On the morning of June 8, 1988, Mrs. Gossinger slipped and fell on soapy water that had flooded the bathroom floor of the apartment the Gossingers had rented from Sutherland, a member of the Association. Immediately after the accident, Mrs. Gossinger drove herself to the Queen's Medical Center (QMC) Emergency Room (ER) where the ER physician on duty examined her. Various diagnostic tests, including x–rays, were performed. Based on the examination and test results, the ER physician concluded that Mrs. Gossinger had suffered a back strain, which he advised her "would take a long time to heal." The ER physician advised Mrs. Gossinger to rest and swim in order to aid her recovery. He also advised her to have a follow–up examination at the beginning of the following week — or sooner if her condition worsened.

The next day, June 9, 1988, the Gossingers wrote to the Association demanding compensation for personal injury and property damage caused by the flooding incident. In their letter (the demand letter), the Gossingers stated:

> We would like compensation for the personal injury and mental stress that your company has put us through.
>
> This includes:

| | |
|---|---|
| 3 months back Rent at 600. per mo | $1800.00 |
| 1 Bathroom Scale . . . | $107.00 |
| Physical Injury & Mental Stress | 600.00 |
| Total | $2507.00 |

We will wait five (5) working [sic] for a response. If nothing is done to compensate us we *will* take legal action immediately!

(Reproduced as in original.) Three days later, on June 12, 1988, Mark Kochi, an insurance adjuster for State Farm Insurance Company (State Farm), the Association's general liability insurance carrier, met with the Gossingers to settle their claims as set forth in the demand letter. As a result of the meeting, the Gossingers settled their claims for the sum of $1,100.00 and signed a release form (the release) drafted by State Farm, which provided:

> For the Sole Consideration of [$1,100.00], the receipt and sufficiency whereof is hereby acknowledged, the undersigned [Gossingers] hereby releases [sic] and forever discharges [sic] [the Association], their heirs, executors, administrators, agents and assigns, *and all other persons, firms or corporations liable or who might be claimed liable, . . . from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature whatsoever, and particularly on account of all injuries, known and unknown, both to person and property, which have resulted or may in the future develop from an accident which occurred on or about the 9th [sic] day of June 1988 . . . .*

(Emphasis added.)

The record reflects that the Gossingers read the release before voluntarily signing it. On the face of the release, the settlement sum included compensation for Mrs. Gossinger's claimed injury. When the Gossingers executed the release Mrs. Gossinger was still suffering from back pain, and the Gossingers knew that Mrs.

Gossinger had not fully recovered from her back injury. In their demand letter, as noted above, the Gossingers had threatened to "take legal action immediately" against the Association if the Association's insurer did not settle their claims.

Approximately one year after signing the release, Mrs. Gossinger's back pain had not subsided. Upon examination by a physician, she was diagnosed as suffering from a herniated disc requiring surgery. The Gossingers incurred over $20,000 in medical expenses for the surgery and follow–up care.

On January 18, 1990, the Gossingers filed a complaint against the Association and Sutherland (collectively the defendants), claiming that they were entitled to damages based on the defendants' negligence in failing to keep the property in a reasonably safe condition and to prevent and warn them of the dangerous condition. Both defendants pleaded, *inter alia*, the affirmative defense of discharge and release based on the Gossingers having voluntarily and knowingly signed the release. On December 20, 1990, the Association filed a motion for summary judgment, and on December 27, 1990, Sutherland filed a joinder in the Association's motion. The Gossingers opposed the motion on the grounds of unilateral or mutual mistake. On March 12, 1991, the circuit court entered an order granting summary judgment in favor of the Association and Sutherland, ruling as follows:

> [T]he Court hereby finds that Plaintiff Phyllis Gossinger was aware of her lower back injury at the time she initiated her demand for payment for, among other things, her physical injury. The Court also finds that she was also aware that the injury would require future treatment and although she was apparently unaware of the extent of the injury or its degree, she nevertheless accepted settlement, indeed urged it, and knowingly signed the Release. The Court finds that under these circumstances, mutual mistake is unavailing.

On March 20, 1991, the Gossingers filed a motion for reconsideration of the order; on April 23, 1991, the motion was denied. The Gossingers filed a timely notice of appeal challenging the two orders.

## II.

## A.

On appeal, the Gossingers contend that the circuit court committed three errors in granting summary judgment in favor of the Association and Sutherland: (1) when it found that Mrs. Gossinger was "aware that the injury would require future treatment" at the time she signed the release; (2) by not allowing the release to be rescinded based on a good faith mistake of fact as to the nature or extent of Mrs. Gossinger's injury; and (3) in disposing, by way of summary adjudication, of the question whether there existed a mutual mistake of fact.

We review an award of summary judgment under the same standard applied by the circuit court. *Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 365, 833 P.2d 70, 74 (1992); *Cuba v. Fernandez*, 71 Haw. 627, 631, 801 P.2d 1208, 1211 (1990); *First Hawaiian Bank v. Weeks*, 70 Haw. 392, 396, 772 P.2d 1187, 1190 (1989). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hawaii Rules of Civil Procedure (HRCP) 56(c) (1990).

At the outset, we note that the present matter does not involve an insurance company initiating contact with an injured party in order to urge a premature settlement of all claims against its insured. On the contrary, the Gossingers initiated the demand that the Association compensate them, in an amount they specifically quantified, for all personal injury and property damage they claimed to have sustained as a result of the flooding incident. We

also note that an insurer that does not respond promptly to a party's settlement demand and does not negotiate settlement in good faith may violate Hawaii Revised Statutes (HRS) §§ 431:13–102 (Spec. Pamphlet 1987) and 431:13–103(a)(10) (Spec. Pamphlet 1987 & Supp. 1990).[1] Thus, in this case, State Farm scrupulously com-

---

[1] HRS § 431:13–102, entitled "Unfair methods of competition; unfair or deceptive acts or practices prohibited," provides in pertinent part:

No person shall engage in this State in any trade practice which is defined in this article as . . . an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.

HRS § 431:13–103, entitled "Unfair methods of competition and unfair or deceptive acts or practices defined," provides in pertinent part:

(a) The following are defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:

\* \* \*

(10) Unfair claim settlement practices. Committing or performing with such frequency as to indicate a general business practice any of the following:

\* \* \*

(B) With respect to claims arising under its policies, failing to respond with reasonable promptness, in no case more than fifteen working days, to communications received from:

(i) The insurer's policyholder, or

(ii) Any other persons, including the commissioner, or

(iii) The insurer of a person involved in an incident in which the insurer's policyholder is also involved.

The response shall be more than an acknowledgment that such person's communication has been received, and shall adequately address the concerns stated in the communication;

\* \* \*

(H) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear . . . .

Violation of HRS §§ 431:13–102 and 431:13–103 potentially subjects an insurer to substantial fines and/or suspension or revocation of the insurer's license pursuant to the provisions of HRS §§ 431:13–201 and 431:13–202 (Spec. Pamphlet 1987 & Supp. 1990).

plied with applicable Hawaii law in responding promptly to the Gossingers' demand letter.

Regarding the Gossingers' first contention, we conclude that the circuit court correctly found that there was no genuine issue of material fact as to whether Mrs. Gossinger was "aware that the injury would require future treatment" at the time she signed the release. As we have indicated, our review of the record reveals that Mrs. Gossinger was advised to have a follow-up examination by the beginning of the following week — or sooner if the pain worsened. Moreover, Mrs. Gossinger testified in her deposition as follows:

Q: Did the doctor tell you to come for or see anyone for followup treatment?

A: He told me it would take a long time to heal and he told me to swim.

\* \* \*

Q: At the time you executed this release, you were still having back pain, I take it?

A: Yes.

Q: So you were not fully recovered, as far as you were concerned, from your back injury correct?

A: No.

Q: That's correct?

A: Yes.

Q: So you were still suffering from your back injuries at the time you executed this release, correct?

A: Yes.

This uncontroverted evidence was sufficient to support the circuit court's finding.[2]

_____

[2] The Gossingers offered Mrs. Gossinger's affidavit as evidence contradicting the circuit court's finding that she was "aware that the injury would require future

The Gossingers claim that, at the time they executed the release, they were "mistaken" as to the extent or nature of Mrs. Gossinger's injury and that therefore they should be allowed to rescind the release, whether the mistake was mutual or unilateral. In the alternative, the Gossingers contend that the issue of mutual mistake was a question of fact inappropriate for summary adjudication. For the reasons set forth below, we hold that the release could not be rescinded based on a mistake as to the nature or extent of Mrs. Gossinger's back injury. Accordingly, the circuit court properly granted summary judgment in favor of the Association and Sutherland and against the Gossingers on this issue.

The general rule applicable in other contexts is that, absent fraud, duress, coercion, undue influence, or other acts of over-reaching by a releasee (insurer), a release can only be avoided by a releasor (injured party) on the grounds of mutual mistake. RESTATEMENT (SECOND) OF CONTRACTS § 152 comment f (1981). Applied to a personal injury case, the rule is as follows:

> If a claim is made for damages for an injury, a compromise settlement is ordinarily not made voidable for mistake because the injury was greater and lasted longer than was expected at the time of the settlement, if the parties knew or had reason to know that the extent of the injury was uncertain and that was the very reason for the compromise.

---

treatment." In her affidavit, Mrs. Gossinger states that she was "told by the treating physician that she would recover in a matter of days," that "no further medical treatment would be necessary," and that rest, heat, sleep on a firm mattress and pain medication "would be sufficient to treat the strain." However, Mrs. Gossinger's affidavit was filed with the Gossingers' motion for reconsideration; because these were facts within the personal knowledge of Mrs. Gossinger, it was incumbent on her to raise them in her initial opposition to the motion for summary judgment. *See Cochran v. Pflueger Automobiles, Inc.*, 72 Haw. 460, 461 n.1, 821 P.2d 934, 935 n.1 (1991) (citing *K.M. Young & Assocs., Inc. v. Cieslik*, 4 Haw. App. 657, 675 P.2d 793 (1983)).

6 A. CORBIN, CORBIN ON CONTRACTS § 1292, at 181–82 (1962) (footnote omitted); *see also* 13 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 1551 (1937).

All parties agree that the only Hawaii authority specifically addressing the issue of when a release, in a personal injury case, can be set aside based on mistake is *Silva v. Robert Hind, Ltd.*, 32 Haw. 936, *reh'g denied*, 32 Haw. 989 (1934), *aff'd*, 75 F.2d 74 (9th Cir. 1935). In *Silva*, the plaintiff (Silva) was injured when struck by a motor vehicle driven by the defendant's employee. *Id.* at 937. Silva received medical care and attention from his own doctor. Upon being informed that he had fully recovered and could return to work thirteen days after the accident, he was advised to see the defendant's insurer. *Id.* At the meeting, he signed a release compensating him for lost wages only but purporting to release the defendant "from all claims . . . or causes of action on account of injuries [sustained]." At the same time, Silva signed a receipt "in full settlement of [his] personal injury claim" against the defendant "as a result of" the accident. *Id.* at 937–38. Thereafter, he collapsed at work from a back wrench and spent the next three or four months in a hospital under his physician's care. *Id.* at 938. The prognosis for recovery was bleak — he would probably remain incapacitated for the rest of his life. *Id.* Silva subsequently sued to have the release rescinded, and the lower court entered judgment in his favor. *Id.* On appeal, this court affirmed the judgment on the basis that the release could be canceled if entered into by the parties under a "mutual mistake." *Id.* at 937, 939, 941. The *Silva* court reasoned:

> In cases such as that at bar an important inquiry is whether the mistake relied upon in aid of a cancellation related to a past or a present fact or related purely to a surmise or opinion as to the future development of a known and existing illness or injury. If the mistake relates

clearly to a past or a present fact the remedy of cancellation will be awarded.

*Id.* at 940–41 (citations omitted). Because "[a] statement by a physician that a patient has fully recovered from an injury received in an accident is a representation concerning an existing fact," and because the physician's statement in the case before it was erroneous, the *Silva* court held that the parties to the release were mutually mistaken as to a present fact, i.e., Silva's complete recovery, and, therefore, that the release could be rescinded. *Id.* The *Silva* court emphasized that:

> [T]he petitioner was in effect told by his physician that he was cured and that there would be no further physical suffering or trouble consequent upon the accident, that the petitioner believed that those were the facts, that the information and opinion of the doctor were communicated to the insurer's representative, . . . and the latter likewise believed in the truth of those facts. . . . *There was no issue between the parties as to what the probable course of development of the injuries would be or as to how long the petitioner would suffer or how long he would be incapacitated or as to the degree of his incapacity. He was cured. His sufferings were ended.*

*Id.* (emphasis added).

The defendants in the present matter construe the holding of *Silva* to allow rescission of a release based on a physician's unequivocal, mistaken statement that the injured party is completely cured. We agree that the defendants correctly construe *Silva*. However, no physician ever told Mrs. Gossinger that she was completely recovered. On the contrary, the Gossingers knew that she had *not* fully recovered from her back injury at the time they signed the release. Therefore, *Silva* does not support the Gossingers' position that the release should be rescinded on the basis

of a mistake as to the extent or nature of Mrs. Gossinger's back injury.

We acknowledge the merit of the Gossingers' argument that the determination whether a release should be rescinded in a personal injury case should not be based on distinctions between mutual and unilateral mistakes. The use of the term "mutual mistake" in cases involving releases for personal injury is really a misnomer because the critical inquiry goes to the knowledge of the injured party at the time the release was signed (i.e., the injured party's understanding of the nature and extent of the injury). *See, e.g., Gleason v. Guzman*, 623 P.2d 378, 385 n.4 (Colo. 1981) (citation omitted)("[C]ourts actually rescind on a finding that the injured party was mistaken, typically that he was unaware of a certain injury. Usually, the other party also will be unaware of the injury, but there is no need to inquire into his state of mind."). In any event, we hold that a mistake, whether mutual or unilateral, as to the nature or extent of an injury is not a proper basis for rescinding a release when the party seeking rescission has initiated and urged settlement of his or her personal injury claims (or has not otherwise been improperly induced into settlement by an unfair claim settlement practice) and has signed the release knowing that he or she is not completely cured and is aware that the injury may require future treatment.[3]

We are aware that some jurisdictions allow a party to rescind a release because the extent or nature of the party's injury is not

---

[3] Other jurisdictions, while still adhering to the formalistic distinction between mutual and unilateral mistake, similarly do not allow an injured party to rescind a release based on a mistake as to the extent or nature of the injury. *See, e.g., Barilla v. Clapshaw*, 306 Minn. 437, 237 N.W.2d 830 (1976) (when parties to a release knowingly and voluntarily agree to release claims for all injuries, they effectively assume the risk of mistake as to the nature and extent of the known injuries); *Bennett v. Shinoda Floral, Inc.*, 108 Wash. 2d 386, 739 P.2d 648 (1987) (mutual mistake is unavailable to rescind a release when the party signing the release knows he or she is injured because the party assumes the risk that the injury will worsen).

known at the time the release is signed.[4]  However, while public policy favors securing fair and just compensation for actionably inflicted injuries, public policy also favors the finality of negotiated settlements that avoid the costs and uncertainties of protracted litigation. *See generally Sylvester v. Animal Emergency Clinic*, 72 Haw. 560, 825 P.2d 1053 (1992). By adopting a rule precluding parties who, in the absence of an unfair claim settlement practice, initiate and finalize settlement of their personal injury claims from rescinding releases based on a "mistake" as to the extent or nature of their injuries, we seek to support both policies by not doing violence to one at the expense of the other. To hold otherwise would effectively render releases useless as a means of achieving finality in the settlement of personal injury claims.[5]

---

[4]  The Gossingers rely heavily on three cases as support for their argument that the release should be rescinded based on their lack of knowledge as to the extent or nature of Mrs. Gossinger's injury: *Witt v. Watkins*, 579 P.2d 1065 (Alaska 1978); *Casey v. Proctor*, 59 Cal. 2d 97, 28 Cal. Rptr. 307, 378 P.2d 579 (1963); and *Williams v. Glash*, 789 S.W.2d 261 (Tex. 1990). However, only *Witt* involved an injured party who was aware of the existence of an injury at the time a release was executed. 579 P.2d at 1066. In the other two cases, the injured parties seeking to rescind a release were completely unaware of any injury at the time of execution. *See Casey*, 59 Cal. 2d at 100–01, 28 Cal. Rptr. at 309, 378 P.2d at 581; *Williams*, 789 S.W.2d at 263. Thus, the latter two cases are inapposite to the present matter. Furthermore, *Witt* is distinguishable because the subsequently discovered injury was not identified until after the injured party had undergone three examinations following the initial emergency room examination. 579 P.2d at 1066–67.

[5]  We agree with Justice Spear's dissent in *Williams* regarding the effect of adopting the position advocated by the Gossingers:

In its effort to afford equitable relief, the court renders useless most releases. How is one to buy peace and settle a claim? If the release here can be avoided, then no release buys peace until the statute of limitations has run. 'Consideration of the conduct of the parties and the information available to them at the time' will present a fact question so as to require a trial in every instance . . . .

Insurers are now faced with a Hobson's choice. If they settle claims promptly, they are not protected from the later assertion of unknown

## B.

The Gossingers also appeal the circuit court's order, entered April 23, 1991, denying their motion for reconsideration of the order granting summary judgment in favor of the Association and Sutherland. The Gossingers' motion for reconsideration was made pursuant to HRCP 59(e) and is permissible as a motion to alter or amend the judgment. *See K.M. Young & Assocs., Inc. v. Cieslik*, 4 Haw. App. 657, 666, 675 P.2d 793, 800 (1983); *Courtney v. Canyon Television & Appliance Rental, Inc.*, 899 F.2d 845, 848 (9th Cir. 1990) (applying Hawaii law). The applicable standard of review is abuse of discretion. *See K.M. Young*, 4 Haw. App. at 666, 675 P.2d at 801; *Courtney*, 899 F.2d at 848.

In *K.M. Young*, the Intermediate Court of Appeals (ICA) discussed the purposes of a motion for reconsideration, acknowledging with approval the following passage from *Seymour v. Potts & Callahan Contracting Co.*, 2 F.R.D. 38 (D.D.C. 1941):

> A great deal of time and labor was given by the court to a hearing and consideration of the original motion . . . .

---

claims. If they refuse to settle until all injuries are known, then they face potential liability under a bad faith claim. Their only alternative is to settle known damages only and this defeats their reason for settling. What the insurer wants is to buy peace and put an end to any further claims; this is the very essence of its position . . . .

789 S.W.2d at 266 (citation omitted). *See also Gleason v. Guzman*, 623 P.2d 378, 391 (Colo. 1981) (Hodges, C.J., dissenting) ("Public policy favors the settlement of disputes without resort to the courts, provided such settlements are fairly reached. For defendants in personal injury cases to be induced to enter into such settlement contracts, they must be assured of a degree of finality. If an injured party can set aside a release contract simply because he was not specifically aware of a consequence of his injury which subsequently developed, any incentive for a defendant to enter into such a release transaction would be nullified. The only safe release from a defendant's viewpoint would be one listing every possible consequence of the known injury. As a practical matter, such an all–inclusive list is an impossibility.") (Citations omitted.)

> . . . Although motions for rehearing ought not to be discountenanced, there has been a growing tendency here to treat them as an ordinary step in the course of a case; and this tendency, I think, should be discouraged. Too often we see motions to rehear of a purely repetitious nature. Again we find them predicated upon factual or legal ground that could or should have been presented at the original hearing. In both instances they necessarily result in delay and wasted effort by court and counsel.
>
> These comments are not intended as any criticism of counsel in this case. They are made only in an effort to discourage a growing tendency to abuse the use of the motion to rehear. It is a motion which has its proper use in our practice, but should be sparingly employed, only where unusual circumstances prevail.

*Id.* at 40 (quoted in *K.M. Young*, 4 Haw. App. at 667, 675 P.2d at 801).

Agreeing with the United States District Court for the District of Columbia, the ICA refused in *K.M. Young* to find that the circuit court had abused its discretion in denying a motion for reconsideration of a summary judgment because the evidence supporting the motion could have and should have been produced in opposition to the original motion. *Id.* The ICA observed:

> If the transaction was in fact a usurious loan disguised as a sale and mandatory repurchase agreement, the facts to prove that defense were uniquely within the personal knowledge of [the movant]. He obviously took part in all negotiations and discussions and was aware of all the facts leading up to the agreement. It was incumbent on him, if he was serious about defending the motion for summary judgment on the grounds of usury, to present those facts to the court before it acted on the motion.

*Id.; see also Cochran v. Pflueger Automobiles, Inc.,* 72 Haw. 460, 461 n.1, 821 P.2d 934, 935 n.1 (1991).

In the matter before us, the only new argument made by the Gossingers in their motion for reconsideration was to challenge the joinder of Sutherland in the Association's motion for summary judgment, based on Sutherland not being a party to the release. The only new evidence offered by the Gossingers was Mrs. Gossinger's affidavit and the transcript of the taped interview of Mrs. Gossinger by the insurance agent who handled the settlement of the Gossingers' claims against the Association. The argument and evidence could and should have been presented to the trial court prior to its determination of the Association's motion for summary judgment and Sutherland's joinder therein. *Id.*

Sutherland filed her joinder on December 27, 1990, over one month prior to the oral argument of the motion for summary judgment. The bases for Sutherland requesting joinder in the Association's motion were that the release included Sutherland as a member of the Association and that the release provided for release of "all . . . persons . . . liable or who might be claimed liable" for the Gossingers' injuries and damages. Although they had ample opportunity to do so, the Gossingers did not oppose the joinder either prior to or at the hearing on the motion. The Gossingers have neither claimed nor shown that they could not have opposed Sutherland's joinder prior to the circuit court's granting summary judgment. Therefore, as illustrated by *Cochran* and *K.M. Young*, the circuit court acted well within its discretion in denying the Gossingers' motion for reconsideration.

### III.

Accordingly, we affirm the circuit court's orders granting summary judgment in favor of the Association and Sutherland and denying the Gossingers' motion for reconsideration.

*Douglas R. Spencer* (Spencer & Richards) for plaintiffs–appellants.

*Paul T. Yamamura* (*Jonathan L. Ortiz* and *Dennis E.W. O'Connor, Jr.* with him on the brief; Ortiz & Yamamura) for defendant–appellee AOAO of the Regency of Ala Wai.

*Edquon Lee* (*George W. Brandt* with him on the brief; Lyons, Brandt, Cook & Hiramatsu) for defendant–appellee Carol Sutherland.

## CONCURRING OPINION OF BURNS, J., WITH WHOM HEEN, J., JOINS

We concur with the result.

The current state of the relevant law across the nation has been succinctly outlined as follows:·

> Cases addressing the problem of mistake in the settlement of personal injury claims reflect a tension stemming, on the one hand, from the general need for finality in the contractual settlements of actual or potential lawsuits and, on the other hand, from a recognized need to alleviate the distorting and unintended effects which human error can impose on a transaction. [Citations omitted.] Although the approaches are not totally discrete, they do lean in different directions. One approach denies rescission even though the injuries were not known or suspected at the time of the settlement. [Citation omitted.] Under this view the releasor assumes the risk that the nature and extent of known injuries might be more severe than was believed at settlement. Another approach allows rescission based on any mistake as to the condition of the injured claimant, whether the mistake relates to the nature of the injuries or to their further

consequences. [Citations omitted.] Midway between these approaches is the view that rescission is available for mistakes relating to the nature of known injuries but not for mistakes as to the future course and effects of those injuries. [Citations omitted.] The assumption here is that rescission must be based on mistake, and mistake for legal purposes must relate to a past or present fact ·rather than an opinion or prophecy about the future. [Citation omitted.]

*Gleason v. Guzman*, 623 P.2d 378, 383 (Colo. 1981).

*Silva v. Robert Hind, Ltd.*, 32 Haw. 936, 939–940 (1934), *aff'd*, 75 F.2d 74 (9th Cir. 1935), subscribed to the third or "midway" approach. It stated:

There can be no doubt of the jurisdiction of courts of equity to cancel contracts which are executed under mutual mistake. This jurisdiction is as well established as is the jurisdiction to cancel contracts secured by fraud. (Citation omitted.) It is equally clear that equitable relief by cancellation on the ground of mutual mistake is as readily granted in the case of a compromise as in the case of any other contract. (Citation omitted.) In cases such as that at bar an important inquiry is whether the mistake relied upon in aid of a cancellation related to a past or a present fact or related purely to a surmise or opinion as to the future development of a known and existing illness or injury. If the mistake relates clearly to a past or a present fact the remedy of cancellation will be awarded. [Citation omitted.]

*Silva* decided that a mistaken understanding that a back injury was cured and the sufferings had ended was a mistake relating to a past or present fact rather than an opinion or prophecy about the future. The result in *Silva* was probably right but *Silva*'s application of the "midway" approach was probably wrong. As noted in

the *Gleason v. Guzman* quote above, the "midway" approach makes rescission "available for mistakes relating to the nature of known injuries but not for mistakes as to the future course and effects of those injuries." The facts in *Silva* are sketchy but it appears that the mistake in *Silva* related to the nature of the back injury. The fact that when the nature of the back injury is changed, the future course and effects of the back injury also change, is consequential and not determinitive. In other words, the parties in *Silva* thought that the injury was a back strain that had been cured whereas subsequent information revealed that the injury was much more serious than a back strain. Such a mistake is a mistake relating to the nature of the injury, a mistake of diagnosis, a mistake as to a past or present fact. An understanding that the injury is cured is not an understanding relating to the nature of the injury that was cured. It is an understanding that there will be no continuation of the injury and no further expenses, pain and suffering from the continuation of the injury. Such an understanding is not based on a past or present fact. It is a prognosis based upon an opinion or prophecy about the future.

Viewing the record most favorably to the Gossingers, their settlement was calculated on the basis of a back strain that would take a long time to heal whereas subsequent information revealed that the settlement should have been calculated on the basis of a herniated disc. In other words, the Gossingers settled on the basis of an erroneous diagnosis, a mistake relating to the nature of the injury, i.e., a back strain versus a herniated disc. Theirs was a mistake relating to a past or present fact. The majority opinion modifies *Silva* in part as follows:

> In any event, we hold that a mistake, whether mutual or unilateral, as to the nature or extent of an injury is not a proper basis for rescinding a release when the party seeking rescission has initiated and urged settlement of his or her personal injury claims (or has not otherwise

been improperly induced into settlement by an unfair claim settlement practice) and has signed the release knowing that he or she is not completely cured and is aware that the injury may require future treatment.

... [W]hile public policy favors securing fair and just compensation for actionably inflicted injuries, public policy also favors the finality of negotiated settlements that avoid the costs and uncertainties of protracted litigation. [Citation omitted.] By adopting a rule precluding parties who, in the absence of an unfair claim settlement practice, initiate and finalize settlement of their personal injury claims from rescinding releases based on a "mistake" as to the extent or nature of their injuries, we seek to support both policies by not doing violence to one at the expense of the other. To hold otherwise would effectively render releases useless as a means of achieving finality in the settlement of personal injury claims.

Majority Opinion, at 11–13 (footnotes omitted).

We recognize that the majority's statement of what is not a proper basis for rescinding a release should not be construed as stating any more than that. Specifically, it should not be read as authority that the opposite is true, i.e., that what is not mentioned is a proper basis for rescinding a release. Even with such a restrictive interpretation, however, we disagree that

a mistake, . . . , as to the nature . . . of an injury is not a proper basis for rescinding a release when the party seeking rescission has initiated and urged settlement of his or her personal injury claims (or has not otherwise been improperly induced into settlement by an unfair claim settlement practice) and has signed the release knowing that he or she is not completely cured and is aware that the injury may require future treatment.

Majority Opinion at 11–12 (footnote omitted).

In our view, (1) absent an unfair claim settlement practice, the question of who initiated and urged settlement is not material; (2) the majority's answer to the question of whether the injured party's unilateral mistake is sometimes and/or always sufficient is unnecessary obiter dicta; and (3) after the injured party has been advised by a medical expert reasonably qualified to diagnose the nature of the injured party's injury that the nature of the injured party's injury has been diagnosed to a reasonable degree of medical probability, it is not unreasonable for an injured party to settle knowing that he or she is not completely cured and that the injury will require future treatment. Therefore, we offer the following holding, which in reality is a proviso to the third "midway" approach:

> The injured party's mistake as to the nature of the injured party's injury is not a proper basis for the injured party's rescission of the injured party's release where the release was issued before the injured party was advised by a medical expert reasonably qualified to diagnose the nature of injured party's injury that the nature of the injured party's injury had been diagnosed to a reasonable degree of medical probability.

Under the "midway" approach as modified, the Gossingers do not qualify for rescission.